

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2007

# Post v. Hartford Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 05-4927

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Post v. Hartford Ins Co" (2007). *2007 Decisions.* Paper 341.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/341

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4927

CAROL A. POST,

Appellant

v.

HARTFORD INSURANCE COMPANY

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 04-cv-03230)
District Judge: Honorable Robert F. Kelly

Argued January 17, 2007

Before: McKEE, AMBRO and STAPLETON, <u>Circuit Judges</u>

(Opinion filed September 13, 2007)

Donald P. Russo, Esquire (Argued)
117 East Broad Street
P.O. Box 1980
Bethlehem, PA 18016

　　　Counsel for Appellant

Brian P. Downey, Esquire (Argued)
Pepper Hamilton
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108-1181

Stacey I. Gregory, Esquire
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

　　　Counsel for Appellee

---

## OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

　　　Carol Post believes that she is entitled to long term disability benefits under her former employer's disability plan.

Her treating physicians maintain that she is disabled. On the other hand, Hartford Insurance Company, the plan administrator (who also happens to fund the plan), has hired reviewing physicians who maintain that Post is not disabled. In other words, the central issue in this case—whether Post is disabled—is a "battle of the experts."

"Battle-of-the-experts" cases are often easy for a reviewing court. If the trial court's standard of review is arbitrary and capricious, then Hartford usually wins when it has produced sufficient evidence supporting its position. It cannot be said to have acted arbitrarily, and summary judgment in its favor is appropriate. On the other hand, if the standard is *de novo*, then summary judgment for either party must be vacated because there is credible evidence on both sides of the key fact question.

But this case, a claim that ERISA benefits were improperly denied, is anything but easy, for the trial court's standard of review is neither arbitrary and capricious (at least in its traditional form) nor *de novo*. In these cases, district courts must select a standard of review that accords with the extent to which the plan administrator operates under a conflict of interest. Here we conclude that the District Court did not select the proper standard of review, and so we vacate and remand for consideration under the standard we deem to apply.

We affirm, however, the Court's grant of summary

judgment on Post's claim for breach of fiduciary duty because it is barred by *res judicata*.

## I.    Facts and Procedural History

Carol Post was in a serious car accident in November 1993, just a few days after having major dental surgery. At the time, she was employed as a dentist by Overlook Hospital in Summit, New Jersey. She sustained a whiplash injury in the accident, but she nonetheless attempted to return to work soon afterward. After six days of working, she was forced to stop because of intractable pain. Overlook, however, offered for her to try working as a pharmacist for a while (as she has both dentistry and pharmacy degrees), and she accepted. She returned to work in December 1993, but was forced to take nearly a day off each week because of pain. After nine months of off-and-on working, she resigned due to pain in September 1994. During this period, she tried numerous physical therapy treatments, none of which significantly improved her condition. She returned to work again in January 1995, but resigned four months later because of continuing pain. She has not worked since.

Post's medical record is voluminous. Between 1993 and 2003, she visited 14 doctors. Her pain management regimens ranged from traditional treatments like prescription drug combinations, trigger-point injections, and various forms of physical therapy, to more exotic treatments like acupuncture and

biofeedback. She reports that none has given her significant relief. Her primary treating physician is currently Dr. Carolyn Britton, a professor of neurology at Columbia University. According to Dr. Britton, Post suffers from chronic post-traumatic pain syndrome characterized by severe myofacial pain; regular, debilitating headaches accompanied by sensitivity to light, nausea, and vomiting; irritable bowel syndrome; and insomnia. Dr. Britton believes that this syndrome is directly attributable to Post's car accident and that it renders her disabled from any sustained employment.

In keeping with Dr. Britton's determination, Post's view of the record is that it indicates that she sustained a traumatic whiplash injury that sensitized her central nervous system, thus triggering the development of chronic pain syndrome. This is Dr. Britton's diagnosis, and it is supported by a number of other evaluations in the record.

Hartford, on the other hand, believes that the record indicates that Post suffered no more than a whiplash injury that has now healed. While it concedes that Post continues to report pain, it contends that the record contains no reliable diagnosis of a recognized debilitating condition. In support of its view, Hartford primarily relies on the reports of Dr. Ekaterina Malievskaia, its reviewing physician, and Dr. Christopher Lynch, who performed an independent medical examination. Hartford also cites the opinions of Drs. Michael John Fiore and

5

Joel Harris,[1] who evaluated Post in 1994 and 1996, respectively.

---

[1] Dr. Harris's conclusion on the issue of disability is, at best, unclear. On a Hartford form, he indicated that Post could sit, stand, walk, and drive for one hour each in an eight-hour workday. The form asked that he circle for each activity a number between one and eight. Zero was not an option. In any event, his responses indicate that she could sit, stand, walk, and drive for a total of four of eight hours. It is unclear how she could maintain employment without sitting, standing, walking, or driving for the other four hours of a typical day.

In addition Dr. Harris noted that Post could not lift or carry any weight at all, not even one pound. Nor could she climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, or feel.

Hartford and our dissenting colleague focus on the fact that, in a section asking what degree of work Post could tolerate, Harris checked "sedentary work." This was the least intensive option available. The form did not provide a way of responding that the patient could not tolerate work at all.

In the comments section of the form, Dr. Harris wrote:

Severe pain — head, neck, & lower jaw.
Back pain limits any mobility without
severe pain. Cannot sit in chair for
treatment without pain.

These comments and responses render the form, at the least, ambiguous as to Post's condition. Read most fairly, the great weight of the form indicates a significant level of disability. It takes a highly selective reading to conclude that it indicates that Post was capable of working (without sitting, standing, walking,

6

This case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, because Overlook Hosiptal's disability plan (the "Plan") is an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1). Post filed a disability claim with Hartford, Overlook's disability carrier, soon after she ceased working in 1995. Hartford approved her claim, subject to periodic renewal. To be considered "totally disabled" under the Plan after December 6, 1997, she had to be "prevented by [d]isability from doing any occupation or work for which [she was] or could become qualified."

From 1995 until 2002, Hartford paid out benefits. In August 1998, the Social Security Administration approved Post's application for disability benefits, citing intractable cervical pain, chronic pain syndrome, and fibromyalgia[2] as the

---

or driving, for half of the workday).

[2] In the words of Judge Posner, fibromyalgia is
a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. See Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 *Arthritis & Rheumatism* 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, *Current*

relevant diagnoses. Soon after Post was approved for Social Security benefits, Hartford asked her to submit a copy of the administrative decision so that it could offset her benefits. She responded through counsel that Hartford was not entitled to an offset under the plain language of the Plan, but she did provide Hartford with a copy of the decision. Hartford eventually relented and accepted Post's reading of the Plan.

For reasons not apparent from the record, sometime in

---

*Medical Diagnosis & Treatment 1995* 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. *Sarchet v. Charter*, 78 F.3d 305, 306–07 (7th Cir. 1996).

late 1999 Hartford took a renewed interest in Post's claim. The company surveilled her and reported in its claim notes that surveillance was unsuccessful, as she was not seen leaving her house. Hartford also began requesting copies of Post's tax records, ostensibly to take a non-Social Security income offset, as the Plan allowed. It provides that "Hartford has the right to require, as part of Proof of Loss: (1) your [Post's] signed statement identifying all Other Income Benefits, and (2) [s]atisfactory proof to the Hartford that you and your Dependents have duly applied for all Other Income Benefits which are available. The Hartford reserves the right to determine if proof of loss is satisfactory." Hartford contends that the "proof . . . that you . . . have duly applied for all Other Income Benefits" language gives it the right to demand tax returns, though it is not clear how a tax return would reflect whether Post had *applied for* other income benefits. The plain language of this provision does not authorize the review of tax returns. (Incidentally, the tax returns confirm that Post was not receiving any income during the disputed period.)

In June 2001, Hartford determined that Post should submit to an independent functional capacity evaluation to confirm her disability. This was permissible under the Plan. Hartford hired a third-party service to notify Post of its request and to set up the evaluation. Because Post had requested that all communication go through counsel, the service's operator phoned her attorney to schedule the evaluation. Here, the confusion began. As Hartford's counsel explained at oral

9

argument, apparently the service's operator told Post's attorney that Post had requested that he be phoned to schedule the evaluation—meaning simply that Post had requested that all communication go through him. Post's attorney took the statement to mean that Post had requested the evaluation; thus, when he spoke with Post and found that she knew nothing about it, he relayed to the service that she had not requested it. It then reported to Hartford that Post had refused an evaluation in violation of the Plan. No written request was ever made.

In lieu of a functional capacity evaluation, Hartford referred Post's file to its medical director, Dr. Malievskaia. She conducted a paper review and concluded that Post was not disabled because of a lack of objective findings, specifically the absence of 11 of 18 potential trigger points that would support a diagnosis of fibromyalgia.

In January 2002, Hartford terminated Post's benefits. In its termination letter, Hartford quoted the Plan's termination triggers, putting the following in bold font: "the date you refuse to be examined, if The Hartford requires an examination." The letter went on to cite as the bases for termination Post's alleged failure to submit to an evaluation at Hartford's request and Dr. Malievskaia's conclusion that Post was not disabled. The letter also invited Post to file an appeal within 60 days and to send any documents that she believed relevant. In March 2002, Hartford denied Post's appeal. Hartford, however, recognized the confusion over scheduling the evaluation and offered to revisit

its decision if she agreed to one. In the meantime, Post had sued Hartford for wrongful denial of benefits, and undergoing an evaluation became part of a settlement agreement. The settlement fully resolved that lawsuit.

Because Post's treating physicians refused to write a prescription for a full-scale functional capacity evaluation, citing the damage it might cause given Post's condition, Hartford agreed to a less strenuous examination. To perform the exam, Hartford hired Dr. Christopher Lynch. The record does not reflect any board certifications or specialties, only that he is a physician. His examination consisted primarily of testing Post for the 18 trigger points for fibromyalgia. Finding tenderness but no definite trigger points, Dr. Lynch concluded that she did not have fibromyalgia or any other disabling condition. After he submitted his report, Hartford issued a final denial of Post's claim. Hartford specifically directed Dr. Lynch *not* to submit his report to Post, so she had no opportunity to respond to it.

Post then filed this suit in the District Court. In it, she claims that Hartford violated 29 U.S.C. § 1132(a)(1) and (2). Subparagraph 1132(a)(1)(B) allows an ERISA plan beneficiary to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Paragraph 1132(a)(2) allows a beneficiary to sue for breaches of fiduciary duties that cause losses to the plan.

11

The District Court granted summary judgment in Hartford's favor on the § 1132(a)(1)(B) claim, ruling that Post could not establish that Hartford acted arbitrarily and capriciously in denying her benefits. The Court also granted Hartford summary judgment on the § 1132(a)(2) claim on the ground that it was barred by *res judicata*. Specifically, the Court noted that it had dismissed that claim with prejudice in Post's previous suit, and so she could not revive it in this suit. Post appeals both rulings.[3]

## II.  Deciding § 1132(a)(1)(B) Claims

### A.  The Sliding Scale Standard of Review

ERISA does not specify the standard of review that a trial court should apply in an action for wrongful denial of benefits. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989), the Supreme Court held that the default standard of review in all § 1132(a)(1)(B) cases is *de novo*. The Court noted in a *dictum* that when a plan by its terms gives the administrator discretion, which the plan at issue in *Firestone* did not, the administrator's decisions are upheld unless they abuse that

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331; we have jurisdiction under 28 U.S.C. § 1291. Because this is an appeal from a grant of summary judgment, our review is plenary. *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 281 (3d Cir. 2005).

12

discretion. *Id.* at 115. On the issue of conflicts of interest, the Court noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (*quoting* Restatement (Second) of Trusts § 187 cmt. d (1959)).

Addressing conflicts of interest in the *post-Firestone* era, most courts of appeals have adopted a "sliding scale" standard of review. This approach grants the administrator deference in accordance with the level of conflict. Thus, if the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most of its discretion is stripped away. *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993).

In Judge Becker's scholarly opinion in *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377, 392 (3d Cir. 2000), we cast our lot with the sliding scale approach. Among the eleven courts of appeals that have reported decisions in this area, six have adopted some version of the sliding scale.[4] *Id.*;

---

[4] The Tenth and Eleventh Circuit Courts, rather than adjusting the level of scrutiny, shift the burden of proof to the administrator when the employee presents evidence of a conflict of interest. *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997,

*Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir. 1999) (*en banc*); *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161–62 (8th Cir. 1998); *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 815 (7th Cir. 1997); *Doe*, 3 F.3d at 87; *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). In addition, the Ninth Circuit Court of Appeals follows a "substantially similar" approach, though it rejects the sliding-scale metaphor. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006) (*en banc*) (choosing simply to note that "[a] district court, when

---

1004–07 (10th Cir. 2004); *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004). The Second Circuit Court of Appeals holds that once the claimant has shown the potential for bias, the court strips away the administrator's discretion and reviews its decision *de novo*. *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1256 (2d Cir. 1996). The First Circuit Court of Appeals applies unvarnished arbitrary and capricious review, *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir. 1999), though two of the six active judges on that Court have criticized this approach. *Denmark v. Liberty Life Assur. Co. of Boston*, 481 F.3d 16, 31 (1st Cir. 2007) (Opinion of Lipez, J.) (urging adoption of the sliding scale); *id.* at 41 (Howard, J., dissenting) (agreeing that the arbitrary and capricious standard should be reconsidered). *But see id.* at 40 (Opinion of Selya, J.) (defending arbitrary and capricious review). The D.C. Circuit Court of Appeals has not yet decided the issue. *See Wagener v. SBC Pension Benefit Plan—Non Bargained Program*, 407 F.3d 395, 402 (D.C. Cir. 2005) (noting the circuit split).

14

faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage"). In *Pinto*, we held that the sliding scale approach was most faithful to *Firestone*'s command that the level of conflict be considered as a factor in shaping arbitrary and capricious review. 214 F.3d at 392.

## B.    Contours of the Sliding Scale

The premise of the sliding scale approach is that courts should examine benefit denials on their facts to determine whether the administrator abused its discretion. *Id.* at 391. To apply the approach, courts first consider the evidence that the administrator acted from an improper motive and heighten their level of scrutiny appropriately. *Id.* at 392. Second, they review the merits of the decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it. *Id.* at 394. If so, its decision stands; if not, the court steps into the shoes of the administrator and rules on the merits itself.

At its best, the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion. This theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, should be district courts' touchstone.

15

**C.** **Sorting Individual Cases**

Determining how to apply heightened arbitrary and capricious review requires considering both structural and procedural factors. *Pinto*, 214 F.3d at 392–93. The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant. While there is no magic to the order in which these inquiries are conducted, our previous cases have considered structure first. We do the same.

**1.** **Structural factors**

Our concern with structure derives from the common law of trusts. As the Supreme Court noted in *Firestone*, the law of trusts requires that courts take a trustee's self-interest into account. 489 U.S. at 115 (*quoting* Restatement (Second) of Trusts § 187 cmt. d (1959)). The Court based this pronouncement primarily on the Second Restatement. Since then, the ALI has published the Third Restatement, which further clarifies that while it is permissible for a trustee to act under a structural conflict of interest, its discretionary decisions "will be subject to especially careful scrutiny." Restatement (Third) of Trusts § 37 cmt. f(1) (2003). Under ERISA, plan administrators are, for most purposes, treated like common-law trustees. *Firestone*, 489 U.S. at 110. Like common-law trustees, plan administrators are accorded discretion and judicial

16

deference (if the plan so provides); in return, they assume fiduciary duties of care and loyalty to their beneficiaries. 29 U.S.C. § 1104(a). So long as we have no reason to doubt the administrator's faithfulness to those duties, this model works well. We, however, are wary of according a fiduciary deference when the structure of the plan gives it financial incentives to act against the participants' interest. *See* Restatement (Third) of Trusts § 50 illus. 1.

As an initial note, federal courts of appeals are split on the issue of what is a structural conflict. We have long held that a structural conflict arises when the administrator has a non-trivial financial incentive to act against the interests of the beneficiaries. *Pinto*, 214 F.3d at 389. Such a conflict is, by itself, sufficient to heighten our review.[5] *Id.* at 390. Our Court's holdings are in line with black-letter trust law. The Second Restatement, on which the Supreme Court relied in *Firestone*, defines a "conflict" as merely "an interest in the trustee conflicting with that of the beneficiaries." Restatement (Second) of Trusts § 187 cmt. d (1959). This statement is worded broadly—almost to the point of being tautological—but

---

[5] In this regard, we share the view of the Fourth, Fifth, Eighth, Tenth, and Eleventh Circuit Courts of Appeals. *See Fought*, 379 F.3d at 1006; *Vega*, 188 F.3d at 295 n.8; *Armstrong v. Aetna Life Ins. Co.*, 128 F.3d 1263, 1265 (8th Cir. 1997); *Doe*, 3 F.3d at 86; *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir. 1990).

it applies by its own terms to a situation in which the administrator has an interest (*e.g.*, in profit or a better bottom line) that is adverse to the interests of beneficiaries seeking payment.

In sharp disagreement, the Court of Appeals for the Seventh Circuit holds that it is improper to label those situations "conflicts of interest." *See Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 776 (7th Cir 2006) (Posner, J.). The problem, it argues, is that we generally assume that parties to a contract are self-interested, and it is inimical to the law of contracts to confuse self-interest with a conflict of interest. *Id.* This is no doubt logical, yet the Supreme Court has held that ERISA places us in the realm of trust law, not contract law. *Firestone*, 489 U.S. at 110–11. Moreover, were we to apply contract law, we would review plans *de novo* from the start, for there is no analog to fiduciary discretion in the common law of contracts. But we are not, and our position, in strict accordance with Supreme Court precedent, follows the common law of trusts.

*Pinto* listed four non-exclusive structural factors for courts to consider: (1) the sophistication of the parties, (2) the information accessible to the beneficiary, (3) the financial arrangement between the employer and administrator, and (4) the financial status of the administrator. 214 F.3d at 392. In subsequent cases, we have also considered the administrator's claim evaluation process, according more deference to

18

administrators that use an independent body to evaluate claims (thus lessening the effect of any conflict). *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 255 (3d Cir. 2004). All of these factors relate to whether the plan is set up so that the administrator has strong financial incentives routinely to deny claims in close cases—in short, whether the administrator's incentives make treating it as an unbiased fiduciary counterintuitive. *Pinto*, 214 F.3d at 388. We emphasize that courts should focus on this question and not get bogged down in factors, for this is anything but a mechanistic test. Rather, it is a broad-based inquiry into whether the structure of the plan raises concerns about the administrator's financial incentive to deny coverage improperly. This makes sense, as ERISA plans come in many forms.

We have held that two aspects of some plans' financial structure raise particular concern: (1) when a plan is funded on a case-by-case basis, *Skretvedt v. E.I. DuPont & De Nemours Co.*, 268 F.3d 167, 174 (3d Cir. 2001), and (2) when it is funded and administered by an outside insurer, *Pinto*, 214 F.3d at 390. Case-by-case funding simply means that the administrator pays claims out of its operating budget, rather than from segregated monies that the employer sets aside according to an actuarial formula. This raises concerns because it means that each dollar paid out is a dollar out of the administrator's pocket. *Stratton*, 363 F.3d at 254. Thus, the administrator has a financial incentive to deny claims.

19

This concern is compounded when it is an outside insurer, rather than the employer, that funds and administers the plan, for we presume that employers have at least some self-interest in seeing that benefits are paid fairly. After all, employees' morale will suffer if they perceive that their benefits are illusory. When the plan is funded by an outside insurer, however, the employer is a step removed from the process, making it less likely to feel the full effects of employee dissatisfaction with claims handling. *Pinto*, 214 F.3d at 389.[6]

We have also noted that when the claimant is a former employee, any dissatisfaction with the claims handling process is less likely to translate into a significant financial disincentive for the employer. *Id.* at 388. In addition, when the employer is in financial difficulty, the dissatisfaction of employees is less likely to be an incentive favoring them because paying off creditors will probably take priority over keeping up employee morale. *Id.* at 392.

Importantly, under Pinto, the structural analysis does not

---

[6] It is worth noting that we have held that when the employer both funds and administers the plan, but pays benefits out of a fully funded and segregated ERISA trust fund rather than its operating budget, no structural conflict of interest is created. *Vitale*, 420 F.3d at 282; *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley*, 248 F.3d 206, 217–18 (3d Cir. 2001).

ask about the administrator's behavior.  Indeed, as *Pinto* held, the structure alone can require heightened review.  214 F.3d at 390.  *Pinto* itself concerned a structure in which the plan administrator was an outside insurance company that received an actuarial premium from the employer.  *Id.*  Thus, what the insurer/administrator paid out came directly off its bottom line. *Pinto* noted that this structure creates a high level of financial conflict of interest, as the insurer/administrator has a strong incentive to construe claims in a light most favorable to it.  *Id.* at 389.  Thus, *Pinto* held that this structure alone gives rise to heightened scrutiny.  *Id.* at 390.

When there is a structural conflict of interest mitigated by independent claim evaluation and no evidence of procedural bias, we have heightened our review only slightly.  *Stratton*, 363 F.3d at 254–56.  The animating logic of that case is that while there was a conflict of interest, there was also good reason to believe that it was of little moment, and so we held that we would defer to the administrator unless its decision was clearly unreasonable or not a product of an exercise of discretion at all.

When structural bias is not mitigated by independent claim evaluation, we have heightened our review a bit more. *See Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 199 (3d Cir. 2002). There, we emphasized that we were not free to substitute our judgment for that of the fiduciary.  Nevertheless, because the record revealed that the administrator had not adequately

21

supported its decision, we concluded that it had not properly exercised its discretion.  *Id.* at 200.

It is worth noting that we have not reported a case in which structural factors alone warranted anything more than moderately heightening our review.  This is not fortuitous. Structural conflicts of interest warrant more searching review, but in the absence of evidence that bias infected the particular decision at issue, we defer to an administrator's reasonable and carefully considered conclusions.  *See Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000).

## 2.     **Procedural Factors**

As *Pinto* held, courts must also examine the process by which the administrator came to its decision to determine whether there is evidence of bias.  214 F.3d at 393.  This sort of evidence can come in many forms, and a review of the caselaw reveals that we have identified numerous procedural irregularities that can raise suspicion.  The following is an illustrative, not exhaustive, list of the irregularities identified: (1) reversal of position without additional medical evidence, *id.*; (2) self-serving selectivity in the use and interpretation of physicians' reports, *id.*; (3) disregarding staff recommendations that benefits be awarded, *id.* at 394; and (4) requesting a medical examination when all of the evidence indicates disability, *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 (3d Cir. 2004).

In considering procedural factors, the focus is whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality. If it has, then the court must decide how much to heighten its scrutiny. If the irregularities are minor, few in number, and not sustained, then they may not counsel for raising the level much at all, for minor glitches reasonably can be chalked up to low-level carelessness. If, however, they are more serious, numerous, or regular, then they should raise more suspicion. *Kosiba*, 384 F.3d at 66; *Pinto*, 214 F.3d at 393. Given the administrator's familiarity with the claims process and the duties of a fiduciary, marked deviations from procedural norms cannot but raise questions about its neutrality.

In the face of significant evidence of procedural bias, we have reviewed its decision closely. *Pinto*, 214 F.3d at 394. When an ERISA administrator is not acting in accord with its fiduciary status, we are naturally wary of according it much of the deference that it would otherwise receive as a result of that status. *Id.* Evidence that an administrator's decision was incorrect, coupled with evidence it was biased, can add up to a conclusion that its decision was not the product of reasoned discretion, but of anti-claimant bias, in which case the decision should be reversed. *Id.* at 395.

In the face of non-trivial evidence of procedural bias, the standard of review should be raised; the more difficult question is how much. In *Kosiba*, we discerned non-trivial evidence of

procedural bias but, as it was neither egregious nor coupled with evidence of structural bias, we heightened our scrutiny only a moderate amount. 384 F.3d at 68. In *Pinto*, on the other hand, we found that the evidence of procedural bias was coupled with evidence of structural bias, and so we heightened our review substantially. 214 F.3d at 394.

### III.    Applying the Sliding Scale to This Case

#### A.    Structural Factors

Addressing the structural factors, the District Court seemed to confuse the structural analyses in *Pinto* and *Stratton*. *Pinto* held that a non-trivial structural conflict gives rise to heightened scrutiny—that is, it pushes the standard of review above the low end of the sliding scale. 214 F.3d at 393. *Stratton* added that when the structural conflict is trivial, the low end of the scale is appropriate. 363 F.3d at 254–55. What made the conflict trivial in *Stratton* was that the employer/administrator, while conflicted, was a step removed from the claim evaluation process. *Id.* Here, on the other hand, the administrator is an outside insurer that makes claims decisions itself. This is the very sort of conflict that *Pinto* declared to be substantial and worthy of raising the standard of review. 214 F.3d at 393. In addition, Post is a former employee, so it is doubtful that her dissatisfaction with the claims-handling process will filter back to Overlook and translate into pressure on Hartford to deal more precisely with

claims.

The District Court correctly noted that the other factors mentioned in *Pinto*—sophistication of the parties, accessibility of information, and the financial status of the administrator—seem not to counsel in favor of heightened scrutiny. Following *Pinto*, however, the structural factors that do present a conflict of interest are sufficient to require at least moderately heightened review. *Id.* We now proceed to whether procedural factors counsel us to increase even more our degree of review.

## B.    Procedural Factors

On the issue of procedural irregularities, the District Court wrote that "procedural anomalies appear to form a pattern of Hartford being overly aggressive in its attempts to reduce or eliminate Post's [disability] benefits and then attempting to rectify the situation when it realized its error." The Court named four aspects of the process that appeared irregular, yet it ultimately concluded that they were too minor to heighten further its scrutiny. We address each in turn and two additional matters brought up by Post.

First, Hartford attempted to use Post's Social Security benefits to offset her disability benefits, despite the Plan not allowing such an offset. After Post's attorney protested, Hartford relented. This, of course, may have been a good-faith

mistake on Hartford's part, but it is a plan administrator's responsibility to know the contents of the plan. Our dissenting colleague believes that the Plan itself was confusing enough that Hartford's mistake was understandable. But Hartford is a large, sophisticated insurance company, and the Plan is its own design. Thus, we are less willing to draw such benign inferences (particularly at the summary judgment stage, where we draw all reasonable inferences in Post's favor) from Hartford's supposed confusion about the contents of its own contract.

Second, Hartford terminated Post's benefits in part because she allegedly refused to undergo a functional capacity evaluation. The record suggests, however, that Post had not refused an evaluation and that Hartford was quick to conclude that she had despite never making a written request. During the appeals process, however, Hartford relented and agreed to reconsider Post's appeal if she would agree to undergo an evaluation. Of concern is that Hartford did not allow Post to see Dr. Lynch's report before making its final decision to terminate. Thus she had no opportunity to allow her treating physicians to comment on it.

Third, Hartford's decision to terminate benefits relied heavily on Dr. Malievskaia's report, which was not based on a physical examination. While the District Court correctly noted that ERISA does not require that plan administrators give the opinions of treating physicians special weight, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823–24 (2003), courts

26

must still consider the circumstances that surround an administrator ordering a paper review. On one hand, nothing in the record specifically suggests that Hartford ordered this review in bad faith, as, we assume, periodic reviews are typical in the industry. On the other hand, we note that at the time of the review the overwhelming weight of evidence in Post's record argued in her favor.[7]

Fourth, Hartford surveilled Post. As the District Court noted, while surveillance is an aggressive tactic, nothing prohibits its use. Post argues that the bothersome point is that Hartford continued to investigate her claim despite its surveillance revealing that she did not leave her home. We agree. The fact that Post did not leave her home while she was under surveillance is perfectly consistent with, and corroborative of, her claim for disability. Yet Hartford was undeterred in

---

[7] Our dissenting colleague views the record differently on this point as well. At the time of the paper review, all of Post's treating physicians' reports save one argued in her favor. It is true that Dr. Fiore in 1994 (before she filed for, and was granted, disability benefits the first time) labeled her "not disabled" after a single examination, but every other doctor—and we include Dr. Harris in this group, *see supra* note 1—indicated a high level of disability through Hartford's 2002 denial of benefits. Given the regular reports indicating disability from her treating physicians, we believe that the record was far in Post's favor at the time of Hartford's paper review.

continuing to pursue evidence that Post was not disabled. Indeed, the very fact that its employees characterized the results of the surveillance as "unsuccessful" suggests that its motive was to find evidence to deny Post's claim.

In addition to these incidents, Post cites Hartford's request for her tax returns as evidence of bad faith. As the District Court pointed out, the Plan did allow Hartford to reduce Post's benefits by the amount of any income she was receiving from working; thus Hartford's request for proof that she was receiving none was not beyond the pale. Nonetheless, Hartford's pursuit of Post's tax returns in the face of ambiguous Plan language is accurately characterized as an aggressive tactic.[8]

---

[8] In this context we note that on February 29, 2000, Hartford demanded that Post submit her 1999 tax return within 30 days. As any taxpayer knows, that return was not due to the IRS until April 15, 2000. Perhaps this was an oversight on Hartford's part, but it reinforces the impression that Hartford was on the offense in its demands for information.

We further note that we cannot agree with our dissenting colleague that the Plan clearly allowed demanding tax returns on penalty of forfeiture. In the Plan, Hartford specifically reserved itself "the right to require, as part of Proof of Loss: (1) your [Post's] signed statement identifying all Other Income Benefits, and (2) [s]atisfactory proof to the Hartford that you and your Dependents have duly applied for all Other Income Benefits which are available." Tax returns do not easily fit into either

Post also cites Hartford's denial of benefits despite a favorable Social Security decision as evidence of bad faith. Our Court has not passed on the relevance of Social Security decisions in determining the appropriate standard of review, but other courts of appeals and some district courts have held that a disagreement with the Social Security Administration is a relevant—though not dispositive—factor. *See Glenn v. MetLife, Inc.*, 461 F.3d 660, 669 (6th Cir. 2006) ("[A]n ERISA plan administrator's failure to address the Social Security Administration's finding that the claimant was 'totally disabled' is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious."); *Lopes v. Metro. Life Ins. Co.*, 332 F.3d 1, 6 n.9 (1st Cir. 2003); *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (*per curiam*); *Edgerton v. CNA Ins. Co.*, 215 F. Supp. 2d 541, 549 (E.D. Pa. 2002); *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001). We agree that a disagreement is relevant though not dispositive, particularly (as here) when the administrator rejects the very diagnoses on

category. As this was Hartford's contract, it had every opportunity expressly to provide for the right to demand tax returns if it wished to do so. But it did not require this expressly. Thus, we believe that threatening forfeiture for refusing to provide information to which the Plan did not give it a right was, at the least, aggressive.

which the Social Security benefits determination is based.[9]

In sum, we agree with the District Court that, on this record, each irregularity here may appear minor. But given their number and regularity, the standard of review should be further heightened. As in *Kosiba*, we recognize that Hartford may offer plausible explanations for those irregularities, but in setting the standard of review the issue is merely whether the process *raises* questions. *See* 384 F.3d at 68. In this case, the sheer number of irregularities coupled with Hartford's aggressive posture raise concerns, and so the standard of review must be heightened. This procedural posture suggests that we move toward the high end of the sliding scale, much as we did in *Pinto*. 214 F.3d at 394.

---

[9] Hartford argues that its conclusion is not necessarily inconsistent with the Social Security Administration's determination, as Post's intractable cervical pain, chronic pain syndrome, and fibromyalgia might have healed between 1998 (when the Social Security Administration awarded her benefits) and 2002 (when Hartford denied them). Perhaps, but neither Dr. Malievskaia nor Dr. Lynch directly addressed the Social Security decision, nor did either of them posit that Post had these disorders but recovered from them. Rather, both seemed to conclude that Post was *never* totally disabled. J.A. 296 (Dr. Lynch's conclusions) & 343–44 (Dr. Malievskaia's conclusions). As their conclusions appear to be in tension with those of the Social Security Administration, we believe the disagreement is relevant.

## C.    Conclusion

Both structural and procedural factors favor a more searching standard of review than was used here.  In light of what we believe the standard of review should be, the District Court erred by applying only slightly heightened review. Moving toward the high end of the sliding scale, the District Court must searchingly review both the merits and the process to determine if Hartford's decision was not the product of reasoned, disinterested discretion. No doubt the evidence on the merits appears close.  But a factfinder reviewing the merits could yet determine that the weight of the medical evidence supports Post and that it, coupled with the evidence of bias, yields the conclusion that Hartford did not properly exercise its discretion.

## IV.    Other Issues

### A.    Closure of the Record

Generally, only evidence in the administrative record is admissible for the purpose of determining whether the plan administrator's decision was arbitrary and capricious.  *Kosiba,* 384 F.3d at 67 n.5; *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997); *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

In the wake of *Pinto*, however, we have modified that

31

holding to allow the consideration of extrinsic evidence when deciding how much to heighten our review. *Kosiba*, 384 F.3d at 67 n.5. That evidence must show "potential biases and conflicts." *Id.* In particular, we have noted that considering evidence of a plan's funding mechanism would be appropriate. *Id.* Here, however, Post's supplemental exhibits are all medical reports. The first five are reports from doctors that Post consulted between 1993 (just after the accident) and 1996. *See* Appellant's Br. 6–9. The last two are summaries of Post's condition prepared by her current doctors at the request of counsel in May 2005 (nearly two years after Hartford issued its final denial of benefits). *Id.* at 18–19, 28. Post has provided no explanation why the reports produced between 1993 and 1996 were not sent to Hartford for its consideration. Similarly, if she wanted Hartford to consider her treating physicians' responses to Dr. Lynch's report or their summaries of her medical condition, she should have submitted them (and thus made them part of the administrative record) soon after she received Hartford's denial of benefits, but she did not. Because all of these documents are medical reports, they are not relevant to the issue of bias; rather, they are only relevant to whether Hartford reached the right decision. Under *Mitchell*, they cannot be considered for that purpose because they were not submitted to Hartford and made part of the record. 113 F.3d at 440. Thus, the District Court acted properly in not considering them.

32

**B.      The Section 1132(a)(2) Claim**

The doctrine of *res judicata* "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and . . . promot[es] judicial economy by preventing needless litigation." *Parklane Hoisery Co. v. Shore*, 439 U.S. 322, 327 (1979). To apply, the following three prongs must be met: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 2001). Here, the parties agree that prongs two and three are met; their dispute is over whether the Court rendered a final judgment on the merits in their previous suit.

In that suit, the District Court dismissed a cause of action alleging violation of 29 U.S.C. § 1132(a)(2) for failure to state a claim. *See Post v. Hartford Life & Accident Ins. Co.*, No. CIV.A. 02-1917, 2002 WL 31741470, at *2 (E.D. Pa. Dec. 6, 2002). Dismissal for failure to state a claim is a final judgment on the merits for *res judicata* purposes. *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 399 n.3 (1981). Moreover, *res judicata* bars not only claims that were brought in the previous action, but also claims that could have been brought. *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 194 (3d Cir. 1999). Thus, for Post to maintain a § 1132(a)(2) claim, she would have to explain to the Court why it could not have been brought in 2002. She has made no attempt to do so.

33

As Hartford notes, Post's claim has the additional problem that it, too, fails properly to allege a violation of § 1132(a)(2). Post seeks to recover individually for Hartford's alleged breach of fiduciary duty. Under § 1132(a)(2) this is impossible, for that section allows beneficiaries to recover assets on behalf of the plan only. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985). In other words, § 1132(a)(2) does not authorize suits for the recovery of individual benefits. *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1162 n.7 (3d Cir. 1990) ("Because plaintiffs here seek to recover benefits allegedly owed to them in their individual capacities, their action is plainly not authorized by either § 409 or § 502(a)(2).").[10]

## V.     Conclusion

We conclude that the District Court should have applied a more searching review to this case because of the non-trivial evidence of structural and procedural bias. Because that was not the standard applied here, we vacate the District Court's grant of summary judgment in Hartford's favor on the § 1132(a)(1)(B) claim and remand for further proceedings.

---

[10] While we have held that individuals can recover in their own capacity for breaches of fiduciary duties under § 1132(a)(3), *see Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1298 (3d Cir. 1993), Post brought her claims only under § 1132(a)(1)(B) and (a)(2).

34

We affirm, however, its grant of summary judgment on the § 1132(a)(2) claim because principles of *res judicata* bar that claim.

*POST v. HARTFORD INSURANCE COMPANY*

No. 05-4927

STAPLETON, <u>Circuit Judge</u>, dissenting:

I agree with the Court that Post's claim under ERISA § 502(a)(2) is barred by principles of *res judicata* and that in determining whether an administrator's denial of benefits is arbitrary or capricious—as contrasted with deciding the appropriate standard of review—a district court is limited to consideration of the evidence that was before the administrator. I therefore join Section IV of the Court's opinion. I disagree, however, with the Court's analysis of Post's claim under ERISA § 502(a)(1)(B), and with the Court's decision to reverse and remand the summary judgment on that claim. I would affirm the judgment of the District Court.

## I. Merits Evidence

36

The benefits decision we are asked to review was communicated to Post in a letter dated October 2, 2003. That letter explains at length the administrator's reasons for declining to continue disability benefits. It describes and principally relies upon an investigation conducted by Dr. Christopher G. Lynch, M.D. Dr. Lynch was engaged by Hartford in order to secure independent evaluation of Post's claim to "total disability" benefits.[11] In the course of his investigation, Dr. Lynch physically examined Post and reviewed all of the medical records accumulated over the preceding ten years.

The administrator's letter accurately reflects Dr. Lynch's report and, like that report, is reasoned, thorough and makes a persuasive case for the conclusion that Post, while suffering from chronic pain syndrome, is not totally disabled. It

---

[11]Under the Plan, to be considered "totally disabled" after December 6, 1997, Post would have to be "prevented by Disability from doing any occupation or work for which [she is] or could become qualified by: (1) training; (2) education; or (3) experience." JA 77. When Post was originally granted benefits, the applicable definition of "totally disabled" was that she was "prevented by Disability from doing all the material and substantial duties of [her] own occupation." Under the terms of the Plan, the definition changed once Post had been disabled for 24 months plus 180 days. JA 76-77, 83.

37

concludes with the following quotations from Dr. Lynch's report:

> Dr. Lynch found that "multiple physical exams have shown nothing more than tender muscles at times and occasional trigger points." According to Dr. Lynch: "An equal number of examinations have found no tender muscles or trigger points. Thus, there can be no consistent physical disability over this period of time."

> With respect to the need to assign physical restrictions and limitations, Dr. Lynch provided these remarks: "Given the multiple normal examinations, including my own of today,[12] I feel

[12]Dr. Lynch's report described his observations during his examination of Post as follows:

> On examination today, she is alert, cooperative and in no distress. Affect is a bit flat. She appeared to be in no distress although she stated she had total body pain.

she could perform sedentary to light work as usually defined – light work, lifting up to 20 pounds maximum with frequent lifting or carrying of objects weighing up to 10 pounds. She should have the ability to change posture at fairly

---

Examination of the upper extremities reveals no deformities. There is no focal motor, reflex or sensory loss. She has normal pain free range of motion in all upper extremity joints including the shoulders. There was no tenderness over the forearm or upper arm musculature.

Examination of the head, neck and back reveals no deformities. Range of motion in the cervical spine was 15-20 degrees of left and right lateral rotation with normal flexion and extension. Range of motion in the low back was 60+ degrees of flexion with 5-10 degrees of extension. Palpation over the cervical and thoracic regions reveals no definite tenderness and no trigger points were palpated. Palpation over the lumbosacral spine reveals no tenderness. She was somewhat tender over the greater trochanters bilaterally. Motor, reflex and sensory exams were normal in the lower extremities. She has normal pain free range of motion in all lower extremity joints. Gait is normal.

JA 292-93.

39

frequent intervals."

> Citing the restrictions and limitations identified by Dr. Lynch, Ms. Post would not be prevented by disability from doing any occupation or work for which she is qualified by training, education or experience.

JA 289-90 (footnote added).

While Post stresses that several treating physicians had expressed the opinion that she was unable to work and that the Social Security Administration found her disabled in 1998, she does not point to any segment of her medical records that contradicts Dr. Lynch's characterizations of those records in these quotations. Nor can Post dispute the fact that Dr. Lynch is the only physician having no continuing relationship with Hartford or Post who physically examined her and studied all of her medical records.

## II.  Standard of Review Evidence

### A.  Structural Factors

Under the teachings of *Pinto*, it is clear that Hartford has a material conflict of interest.  It serves as both payor and decision maker and there are no other factors that ameliorate the incentive thus created to deny benefits.  This calls for a "heightening" of the "arbitrary or capricious" standard of review which is applicable in all cases where an ERISA plan vests discretion in the administrator.

> [A] heightened standard of review would appear to be appropriate when a plan funder like an insurance company "incurs a direct expense," the consequences to it are direct and contemporary, and, while it has incentives to maintain good business relationships, it lacks the incentive to "avoid the loss of morale and higher wage demands that result [for an employer] from a denial of benefits."

41

\* \* \*

For all the foregoing reasons, we believe that a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds.

*Pinto*, 214 F.3d at 389, 390; *see also Kosiba v. Merck & Co.*, 384 F.3d 58, 65-66 (3d Cir. 2004).

## B. Procedural Factors

It is equally clear from *Pinto* that the "heightened" review arising from this structural conflict of interest would be "ratcheted upward" if there were anomalies in the procedure by which the administrator's decision was reached that give the Court reason to doubt its fiduciary neutrality. *Pinto*, 214 F.3d at 394; *Kosiba*, 384 F.3d at 66. I believe a fair reading of the record in this case fails to suggest anything other than neutrality, however. To the contrary, the record affirmatively suggests that Hartford's search for the answer to the "total disability" issue

42

was conducted in a fair, impartial and cooperative manner. Each of the anomalies that trouble the Court appear troubling only if one engages in speculation having no record support.

It is true, as the Court notes, that Hartford requested a copy of Post's social security award so that it could offset her social security benefits against her disability benefits. This mistake was understandable, however, and promptly corrected when the error was called to Hartford's attention. The ERISA plan of Post's former employer, which Hartford administers, appears to be a standard form, but with an attached state-specific section titled "Statutory Provisions," which, the Plan states, "are included to bring your booklet-certificate into conformity with . . . state law." JA 78. If one reads Post's benefits Plan without paying careful attention to the statutory provisions, the Plan would appear to allow Hartford to use Post's Social Security benefits to offset her disability benefits. In the portion of the Plan titled "Calculation of Monthly Benefit," part of step 2 of the calculation is to "subtract all Other Income Benefits, including those for which you could collect but did not apply." JA 99. In the definitions section of the Plan, "Other Income Benefits" is defined by a list, of which item (4) of the first paragraph is "[t]he amount of disability or retirement benefits under the United States Social Security Act to which you may be entitled because of disability retirement." JA 86. The "statutory provisions" of the Plan – reflecting New Jersey law – state, however, that "[i]tems (3) and (4) of the first paragraph of the definition of Other Income Benefits are deleted." JA 78. After Hartford requested the award letter, Post's counsel responded

43

with a letter calling Hartford's attention to the error:

> As promised, here is the Notice of Award, and the language in the policy deleting Social Security Benefits from the definition of "Other Income Benefits," as well as the deleted language itself. As you can see, pursuant to New Jersey law, the situs of this contract, Hartford has no right to take a credit or deduction for or from its obligation due to Social Security's payments.

JA 216. An internal communication at Hartford reflects that Hartford then researched the issue, agreed with Post's counsel's assessment, and determined to "change case management" accordingly "so that [it could] correctly administer claims under this Policy." JA 231.

It is also true, as the Court notes, that Hartford at one point stated that benefits were being terminated in part because Post had declined to undergo a functional capacity evaluation ("FCE"). While Post had not at that point declined to take an FCE, Hartford's error clearly cannot be attributed to a lack of neutrality on its part. On June 18, 2001, Hartford was advised in writing by Empire Medical Management ("EMM"), an independent medical firm that had attempted to arrange an FCE

44

through Post's counsel, that she had refused such an examination. In short, Hartford was not a party to the miscommunication that led to this misunderstanding and ultimately revised its position. Moreover, when one of Post's physicians later expressed concern about whether an FCE would aggravate her symptoms, Hartford accommodated those concerns by agreeing to settle for the less strenuous independent medical evaluation ("IME") that was conducted by Dr. Lynch.

The Court cites as its second anomaly Hartford's failure to afford Post an opportunity to comment on Dr. Lynch's report before sending its October 3, 2003, letter. While the Court correctly notes that no explanation for this appears in the record, that is not surprising in light of the fact that Post did not maintain before the District Court or before us that this was a matter of concern for her. Post was given a full opportunity to develop a record before the administrator, and neither the section of the Plan addressing her appeal rights nor ERISA § 503(2) (addressing internal appeal rights) provides a right to comment on the report of an independent medical consultant under the circumstances of this case.

Third, the majority finds evidence of bad faith in the fact that Hartford's initial decision to terminate Post's benefits "relied heavily on Dr. Malievskaia's report," because (1) Dr. Malievskaia's report was not based on a physical examination, and (2) "the overwhelming weight of evidence in Post's record

45

argued in her favor." Dr. Malievskaia was an Associate Medical Director of Medical Advisory Group ("MAG"), a medical consulting firm that Hartford engaged in the summer of 2001 following EMM's June 18, 2001, letter advising of Post's refusal to submit to an FCE, to "review [Post's] medical records and speak to [Post's] primary care physician in order to identify [her] functional capabilities and address the claimant's ability to perform [a] sedentary to light occupation." JA 339. Dr. Malievskaia did interview two treating physicians and submitted her report on September 20, 2001. That report was not relied upon in the October 3, 2003, decision letter that we are reviewing. It was, however, relied upon in Hartford's original decision letter of January 4, 2002, the same letter that relied in part on what Hartford then understood to be Post's refusal to be examined. This context, in my view, precludes drawing an inference against Hartford from its reliance on Dr. Malievskaia's report. Given that Hartford believed that Post had refused to be examined, and that that fact alone was a sufficient reason to terminate her benefits, it makes little sense to penalize Hartford for taking additional steps to ascertain Post's medical condition. Moreover, as that report and Hartford's January 4th letter evidence, the overwhelming weight of evidence in Post's record did not argue in her favor.[13]

---

[13]While the evidence in Post's record indicated that she suffered from chronic pain, to be eligible for benefits at that point, Post had to be "prevented by Disability from doing *any* occupation or work for which [she is] or could become qualified by: (1) training; (2) education; or (3) experience." JA 77 (emphasis added). In 1994, ten months after her initial injury,

Dr. Michael Fiore noted that Post had no lacerations, bruises, swelling or broken bones, diagnosed her with a "cervical sprain/strain," and concluded that she was "not disabled" and "may participate in full activity as tolerated." JA 196-98. In 1996, Dr. Joel Harris examined Post and concluded that although she had severe pain in her head and neck area, she was capable of doing sedentary work. JA 265. The Court notes that sedentary work was the "least intensive option available," but nothing prevented Dr. Harris from indicating, as Dr. Britton did on the same form, JA256, that Post was incapable of doing sedentary work. New Jersey's medical examiner found that Post "could perform medium exertional work with limited reaching." JA 46.

Although several of Post's doctors tested her for "trigger points" and diagnosed her with fibromyalgia, their ultimate diagnoses were based on self-reported symptoms, and none of the doctors ever found the requisite eleven of eighteen trigger points needed to support such a diagnosis. There are several references in Post's medical records to "trigger points," all of which indicate that she had fewer than eleven. JA 262 (Dr. Mulford in March 1995, finding "some trigger points in the sternocleidomastoid and scalenes"); JA 259 (Dr. Mulford in November 1995, finding "several trigger points in the upper cervical spine at the occiput and over the cervical facets"); JA 258 (Dr. Mulford in 1996, finding "no palpable muscle spasm or trigger points at this time"); JA 318-19 (Dr. Kaufman in May 2000, finding "trigger points on the right side . . . [and] Another trigger point in the infraspinatous region on the left side," but none in several other places); JA 317 (Dr. Kaufman in October

47

Fourth, the Court holds that a Hartford employee's use of the term "unsuccessful" in an internal e-mail to describe

2000 finding two trigger points); JA 293-95.0 The "trigger point" test is recognized in the case law and the medical literature as a prerequisite to a diagnosis of fibromyalgia. *See Sarchet v. Carter*, 78 F.3d 305, 306-07 (7th Cir. 1996) (discussing the trigger point test); *Chronister v. Baptist Health*, 442 F.3d 648, 656 (8th Cir. 2006) (same, citing *Sarchet*); *Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 303 (4th Cir. 2004) (same); *Hawkins v. First Union Corporation Long-Term Disability*, 326 F.3d 914, 919 (7th Cir. 2003) (same); *Stedman's Concise Medical Dictionary for the Health Profession* 361 (4th ed. 2001) (defining fibromyalgia as "a condition of chronic diffuse widespread aching and stiffness affecting muscles and soft tissues; *diagnosis requires 11 of 18 specific tender points . . . .*"). Admittedly, Post's file contained the opinions of several treating physicians to the effect that she was completely disabled, but it is not a fair assessment of the record to say that the evidence in her favor was sufficiently overwhelming as to raise a legitimate inference of bad faith when Hartford's administrator disagreed with those conclusions. This is not, therefore, a situation like *Kosiba*, where the claimant's "physician's reports uniformly supported her contentions" of disability, and there was no comparable evidence supporting the insurer's contrary view at the time it ordered an examination." 384 F.3d at 67.

Hartford's surveillance of Post counsels heightened review. The only evidence in the record on this point is one line of an internal e-mail stating "Surveillance was unsuccessful as the claimant was not observed leaving her home." JA227. In the Court's view, the use of the word "unsuccessful" suggests that Hartford's "motive was to find evidence to deny Post's claim." I do not agree.

As the Court recognizes, surveillance by an insurance company is not *per se* suspicious. *See, e.g.*, *Delta Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir. 2001) ("[T]here is nothing procedurally improper about the use of surveillance."); *Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 76-77 (1st Cir. 2006) (district court properly held that surveillance was for the purpose of objective documentation of disability rather than to deny benefits). Hartford's employee's description of the surveillance as "unsuccessful" may support an inference of bias only if one supposes that Post's leaving her home could only produce evidence that would undermine her claim. If Post left her home to jog or play sports, that would certainly undermine her claim to disability benefits. On the other hand, if she used a wheelchair to move from her door to a waiting wheelchair transport vehicle, or hobbled gingerly on crutches, that would support her claim to disability benefits. The only reasonable inference—if any inference may be drawn with confidence—is that the use of the word "unsuccessful" meant that Hartford's surveilleur was unable to observe Post at all due to the fact that she did not leave her home, and thus could neither confirm nor

49

deny her disability.

Unlike the Court, I am unwilling to characterize Hartford's request for tax returns as an "aggressive tactic." The Plan entitles Hartford to reduce Post's benefits by the amount of income she received from working. Contrary to the majority's suggestion, there is nothing "ambiguous" about the Plan in that respect. In Hartford's May 12 and June 19, 2000, letters to Post and her attorneys requesting tax returns, Hartford quoted the language of the policy pertaining to the calculation of Post's benefits, specifically emphasizing the text that directed Hartford to subtract "all other income from any employer or for any work." JA 214, 219. At the time Hartford requested Post's returns, Post was collecting "total disability" benefits under the theory that she was prevented from doing *any* work by a disabling condition. In that light, it hardly seems unreasonable or suggestive of bad faith for Hartford to request tax returns, as Post's report to the government of her employment status during her period of alleged total disability would be probative evidence of whether Post was in fact "prevented by Disability from doing *any* occupation or work for which [she is] or could become qualified."

Finally, the Court suggests that a disagreement between Hartford's October 3, 2003, decision and the August 11, 1998, decision of the Social Security Administration "is relevant though not dispositive" of whether the former was arbitrary and

50

capricious. Op. at 29. Suffice it to say, the administrative law judge in 1998 did not have the benefit of the record before Hartford in 2003, and no review of Post's continued eligibility for social security benefits has been undertaken since 1998. *See Pari-Fasano v. ITT Hartford Life & Acc. Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000). In *Pinto* and other cases in which courts have applied heightened scrutiny to an administrator's denial of benefits in the face of a social security award, they have done so not because of the mere fact of conflict with the SSA's determination, but because there is something suspicious about the *manner* in which the SSA decision is disregarded or disagreed with. In *Pinto*, for example, we were concerned with the fact that the administrator showed inexplicably greater deference to the SSA's determination that the claimant was *not* disabled than to the SSA's subsequent reversal of its initial determination. *Pinto*, 214 F.3d 393-94. Similarly, in *Harden v. Am. Express Fin. Corp.*, 384 F.3d 498, 500 (8th Cir. 2004), the court applied greater scrutiny where the insurance company led the claimant to believe that it was considering his SSA records when it in fact was not. In other instances, where a plan requires the beneficiary to apply for Social Security benefits and takes an offset if the Social Security claim succeeds—which Hartford does not do here because of New Jersey state law—courts have applied heightened scrutiny to ensure that the administrator does not make self-servingly selective use of the SSA's determinations by giving weight only to those determinations that go against the claimant. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294-95 (6th Cir. 2005) (finding that where the plan at issue had such a requirement, an administrator's disagreement with the SSA's determination "counsel[ed] a certain scepticism" that the court should consider

51

as a factor in determining whether the administrator's decision was arbitrary and capricious); *Wilkerson v. Reliance Std. Life Ins. Co.*, No. 99-4799, 2001 WL 484126 at *1 (E.D. Pa. Mar. 6, 2001) ("[D]efendant is in the seemingly anomalous position of requiring plaintiff to refund some of the disability benefits received from the defendant because offset by Social Security disability benefits, and then failing to give any consideration to the continuation of Social Security benefits as evidence of continued total disability.")

I disagree with the Court's suggestion that any of these "anomalies," either alone or in combination, should alter our standard of review in this case.

## C. Resulting Standard of Review

I thus view this as a case in which the decision maker had a material, inherent conflict of interest, but in which there is no significant evidence regarding its processing of the claim to benefits which suggests anything other than an impartial exercise of fiduciary discretion. It is clear from *Pinto* that such a situation calls for a "heightened" application of the arbitrary and capricious standard of review.

In *Pinto*, we adopted a "sliding scale" approach that "allows each case to be examined on its facts." It teaches that district courts "should consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of benefit determinations of discretionary decisionmakers." *Pinto*, 214 F.3d at 393. As *Pinto* expressly acknowledged, however, "the routine legal meaning of an arbitrary and capricious decision is . . . a decision 'without reason, unsupported by substantial evidence or erroneous as a matter of law,'" and "[o]nce the conflict becomes a 'factor' . . . it is not clear how the process required by the typical arbitrary and capricious review changes." *Id.* at 392. The standard of review we ultimately adopted in *Pinto* was of necessity an imprecise one: the review is to be "more penetrating the greater the suspicion of partiality, less penetrating the smaller the suspicion is." *Id.* at 392-93 (quoting from *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631 (5th Cir. 1992)). District courts, we instructed, must "approximately calibrat[e] the intensity of [their] review to the intensity of the conflict." *Id.* at 393.

It must be kept in mind, however, that the arbitrary and capricious standard, even when heightened, remains a deferential one. *See Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004); *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 & n.3 (3d Cir. 2002). The sliding scale, throughout its entire range, measures the deference to be afforded the decision of an administrator upon whom the plan has conferred discretion regarding benefits. Even where the conflict and/or procedural irregularities are most serious, this means only that the Court

53

will "require that the record contain substantial evidence bordering on a preponderance to uphold [the administrator's] decision." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir. 1998). Stated conversely, if the evidence in the administrative record renders it more likely than not that the administrator's decision is correct, it necessarily follows that the decision must stand wherever on the arbitrary and capricious sliding scale the case may fall. In short, if the decision withstands *de novo* review, it matters not how little deference is accorded. *See Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1139 (11th Cir. 2004) ("Because no grounds exist to disturb Kemper's determination under the de novo review standard, we need not review it under the more deferential ('mere' or 'heightened' arbitrary and capricious) standard.").

As the Court recognizes, while Hartford's structural conflict calls for "heightened" review, in the absence of evidence of procedural bias it does not place this case at the upper end of the scale. Under our case law, as the Court explains, "[s]tructural conflicts of interest warrant more searching review, but in the absence of evidence that bias infected the particular decision at issue, we defer to an administrator's reasonable and carefully considered conclusions." Op. at 21. I agree with this reading of our jurisprudence, and because I believe no court reviewing the record before Hartford and affording its decision this kind of deference, or indeed deference of any significant degree, could appropriately overturn that decision, I would affirm the summary judgment in its favor.

54

## III.  Disposition


Post's case presented difficult issues for an administrator to resolve.  She originally suffered a "whiplash injury," which Dr. Fiore described as a "cervical [neck] sprain/strain." JA 196-98.  She had no bruises, lacerations, or broken bones, and magnetic resonance imagery revealed no tears, nerve damage, or slipped or herniated discs.  Post nevertheless complained, over the next decade, of total body pain sufficiently severe to prevent her from any employment.  Throughout that period, she was treated by physicians who prescribed medications and other therapy which were expected by them to alleviate this pain, but to no avail.  Her condition did not improve.  Post's treating physicians did not reach a consensus with regard to the cause of her pain.  Several suggested psychiatric or psychological therapies be undertaken, but Post declined to pursue that course.  Two physicians suggested Post suffered from fibromyalgia, but their records did not reflect anything approaching the clinical evidence necessary to support that diagnosis.  While several treating physicians expressed the opinion that Post was unable to perform any work, those opinions were based solely upon the patient's report of her symptoms.  No clinical or other personal observations of Post were reported in support of those opinions.


Given this medical history, Hartford reasonably sought information to confirm or negate Post's claims to continued benefits.  It did so by requesting additional information from

55

Post and her treating physicians and by seeking the counsel of an independent consultant, Dr. Lynch. As I have earlier noted, his report indicates that his investigation was thorough and impartial. Dr. Lynch addressed the conclusions of Post's prior treating physicians, contrasted those conclusions with the medical records and with his own findings after a physical examination, and ultimately concluded that although she was disabled by some kind of pain disorder, she was not sufficiently disabled as to meet the plan definition of total disability. Dr. Lynch's report is not unassailable, but it is reasoned, consistent with the rest of Post's medical records, persuasively establishes that there is no objective evidence to support Post's claim of total disability, and clearly provides a rational basis for concluding that she is able to perform sedentary work.

In short, the administrative record before Hartford on October 3, 2003 provides clear and convincing support for the conclusion that Post had not established entitlement to continuing benefits. That conclusion of the administrator was reasonable and carefully considered, and I believe any reviewing court would be required by our case law to defer to it. Accordingly, I would affirm the District Court's summary judgment in favor of Hartford.[14]

---

[14]I would not remand for further proceedings. Our review of the District Court's summary judgment is plenary and, as the Court recognizes, the merits decision must be made on the basis of the administrative record. Given that record, the District

Court would have no basis on remand for doing anything other than accepting Hartford's decision.  While it is not material to my decision to affirm, rather than remand, I note that Post, of course, has no right to a jury review of the administrator's decision.  *Turner v. CF&I Steel Corp.*, 770 F.2d 43 (3d Cir. 1985).

57