

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# Elsmere Park Club v. Elsmere

Precedential or Non-Precedential: Precedential

Docket No. 07-1821

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Elsmere Park Club v. Elsmere" (2008). *2008 Decisions.* Paper 452.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/452

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-1821

ELSMERE PARK CLUB, L.P.,
a Delaware limited partnership,

Appellant

v.

TOWN OF ELSMERE, a Delaware municipal
corporation; ELLIS J. BLOMQUIST;
EUGENE BONEKER; JOHN GILES

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 04-cv-01321)
District Judge: Honorable Sue L. Robinson

Argued: April 15, 2008

Before: AMBRO, FISHER, and MICHEL,[*] <u>Circuit Judges</u>

Opinion filed: September 9, 2008

Douglas F. Schleicher, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers, LLP
260 South Broad Street, Suite 400
Philadelphia, PA 19102

David S. Eagle, Esquire (Argued)
Klehr, Harrison, Harvey, Branzburg & Ellers, LLP
919 Market Street, Suite 1000
Wilmington, DE 19083

      Counsel for Appellant

Edward M. McNally, Esquire (Argued)
Liza H. Sherman, Esquire
Jason C. Jowers, Esquire
Morris James
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899

      Counsel for Appellees

---

[*]Honorable Paul R. Michel, Chief Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

## OPINION OF THE COURT

AMBRO, Circuit Judge

We decide whether the Town of Elsmere, Delaware, violated Elsmere Park Club's procedural due process rights under the Fourteenth Amendment to our Constitution when the Town condemned the Club's apartment complex without offering a predeprivation hearing. We hold that the Town did not run afoul of the Constitution because postdeprivation process was all that was required given the circumstances of this case. Because the Town provided adequate postdeprivation process by way of an administrative appeal, and the Club failed to avail itself of that process, we affirm the District Court's grant of summary judgment against the Club.

## I. Facts

The Club is the former owner of the Elsmere Park Apartments ("Apartments"). The Apartments are a complex of thirty-nine buildings, arranged in nine separate groups. They contain a total of 156 garden-style apartments, including one basement unit in each of the thirty-nine buildings. After severe flooding from Hurricane Hugo in 1989, the Town prohibited the Club from renting out its basement apartments, but allowed continued use of the above-ground units. The Club then

3

boarded up the basement apartments with plywood. In 1996, after increasing incidents of vandalism, the Town instructed the Club to brick over the basement windows and seal the basement apartments.

All was relatively quiet between the Town and the Club between 1996 and 2002. Then, on Tuesday, October 1, 2002, while conducting a routine pre-rental inspection of the Apartments, the Town's Code Inspector, Ellis Blomquist, detected a strong smell of mold. Blomquist returned to the Apartments on Friday, October 4, with Kenneth Belmont, a representative from the State of Delaware Department of Public Health. They inspected two of the sealed basement units and found mold, water leaks, and raw sewage, amounting to various violations of the Elsmere Town Building Code. After observing the mold, Blomquist and Belmont sought the advice of Gerald Llewellyn, Chief Toxicologist for the State of Delaware. Llewellyn concluded that the conditions in the basements posed a serious health threat to the buildings' residents due to what he saw as the likelihood that mold spores were migrating up to the occupied units through openings such as pipe chases and ventilation ducts. Together, Llewellyn and Belmont recommended that the two buildings be condemned and vacated immediately. Blomquist agreed, and, after informing the Apartment's on-site manager (Darlene Groki) of his decision, proceeded to condemn the buildings and vacate the residents.

On Monday, October 7, the inspections of the basements

4

resumed.[1] Blomquist, Belmont, Llewellyn and George Yocher, an environmental epidemiologist for the State of Delaware, proceeded to go through the remaining basements, along with several stairways and some unoccupied apartments, condemning each building they inspected. By Thursday, October 10, 2002, every building except the one housing the complex's rental management office had been condemned. It appears that no time in the Town's inspection did it examine any occupied apartments, and the record does not note what category of mold was present in the basements.

As the condemnations were occurring, the Club filed a motion for a temporary restraining order in the Delaware Court of Chancery, asserting, *inter alia*, that the Town had effected an unconstitutional taking by condemning the thirty-eight buildings without compensating the Club. After a hearing, the Chancery Court denied relief. In so holding, the Court found that the Town had been justified in invoking its emergency powers to condemn the property.[2]

_____

[1]A public meeting was held on Saturday, October 5, at the Elsmere Town Hall to discuss the conditions at the Apartments and the Town's actions. We have no record of what occurred at that meeting.

[2] As noted below, it is not clear that the Town in fact invoked its emergency procedures. *See infra* Part III.A. Nonetheless the Chancery Court hearing proceeded under the assumption that the Town had been acting pursuant to those

At the end of October 2002, the Club notified the Town that it intended to appeal the condemnation of the Apartments. It sent a letter to the Town asking for a hearing before the "Board of Building Appeals," which was listed in the Elsmere Town Code as the appropriate body for hearing such appeals. In correspondence with the Town Solicitor, the Club was told that the Town actually referred to its appellate body as the Board of Adjustment. The Town Solicitor explained that the "Board of Building Appeals" reference came from a code section that had been borrowed from the National Building Code and incorporated into the Town's Code without being adjusted to reflect the Town's particular usage. In January 2003, the Club and the Town Solicitor executed an agreement to stay the Club's administrative appeal, and the Club, by its own admission, "abandoned its administrative appeal." Club's Br. 13. In April 2003, the Club sold the Apartments at a fire-sale price.

A year and a half later, the Club brought an action under 42 U.S.C. § 1983 in the United States District Court for the District of Delaware against the Town and several of its agents. In its complaint, the Club alleged that the Town deprived it of due process when the Town condemned and evacuated the Apartments without first affording the Club the opportunity for a hearing or the chance to cure the alleged code violations. The Town later filed a motion for summary judgment, asserting that exigent circumstances justified its failure to give the Club a

powers.

6

predeprivation hearing and that the Club had failed to avail itself of the Town's postdeprivation procedure.

The District Court concluded that the Town "failed to present sufficient evidence of exigent circumstances to justify the absence of any pre-deprivation due process [rights]." *Elsmere Park Club, L.P. v. Town of Elsmere*, 474 F. Supp. 2d 638, 647 (D. Del. 2007). The Court found it significant that Blomquist and other Town representatives made the decision to condemn the apartments without first inspecting any of the occupied units or taking air samples. *Id.* Moreover, it noted that "the record contains no evidence that any residents actually complained of, or suffered from, mold-related ailments or conditions in their units." *Id.* As such, the Court concluded that Town had violated the Club's due process rights in not offering a predeprivation opportunity to oppose the condemnation. *Id.* at 649.

Despite having found a procedural due process violation, the Court went on to conclude that the Club was ineligible for relief because it had failed to avail itself of the Town's postdeprivation hearing procedure. *Id.* at 649–650 (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000), for the proposition that a plaintiff alleging a procedural due process violation must have taken advantage of all available local process in order to claim a constitutional injury). It therefore entered summary judgment in favor of the Town. *Elsmere*, 474 F. Supp. 2d at 650. The Club appeals.

7

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 451 (3d Cir. 2006). Summary judgment is appropriate if there is "no genuine issue as to any material fact" and the party making the motion "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). We may affirm the District Court's judgment on any grounds supported by the record. *In re Teleglobe Communications Corp.*, 493 F.3d 345, 385 (3d Cir. 2007).

## III. Analysis

The Club contends that the Town violated its rights to procedural due process in two ways: first, in failing to provide a hearing before condemning the Apartments, and, second, in offering what the Club argues were inadequate means for challenging the condemnations after they occurred.

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. "A

8

fundamental requirement of due process is the opportunity to be heard." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal quotation marks omitted). That opportunity "must be granted at a meaningful time and in a meaningful manner." *Id.* In the typical situation, the hearing should come before the Government deprives a person of his property. This makes practical sense, "[f]or when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

Nonetheless, the Supreme Court has held that, in special circumstances, a state may satisfy the requirements of procedural due process merely by making available "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981). Where there is "the necessity of quick action by the State," or where "providing any meaningful predeprivation process" would be impractical, the Government is relieved of the usual obligation to provide a predeprivation hearing. *Id.*

Our first task, then, is to determine whether the Town was faced with circumstances in which it was required to provide a predeprivation hearing. If so, then no amount of postdeprivation process could cure the Town's initial failure to

9

provide a hearing.[3]  *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); *Alvin v. Suzuki*, 227 F.3d 107, 120 (3d Cir. 2000) ("[I]f the Constitution requires pre-termination procedures, the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures.").  If, on the other hand, the Town was faced with such exceptional circumstances that no predeprivation hearing was required, then the question becomes whether it made adequate postdeprivation procedures available to the Club. *Parratt*, 451 U.S. at 539.

### A.  Was a Predeprivation Hearing Required?

It is beyond question "that summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Recl. Ass'n*, 452 U.S. 264, 300 (1981); *see also Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998) ("No one can seriously doubt that emergency conditions may exist

---

[3]  Thus, concluding that a predeprivation hearing was required made summary judgment in favor of the Town not available when that judgment was based on the Club's failure to avail itself of postdeprivation remedies.  We nevertheless affirm the grant of summary judgment because, as explained below, we conclude that no predeprivation hearing was required given the exigencies then existing.

10

(*e.g.*, a severe fire hazard) that would warrant a peremptory shutdown of a residential building."). The Club, however, is not disputing that, where there is a threat to public health or safety requiring prompt action, the Government may act quickly to eliminate that threat. Rather, the Club argues that the mold situation did not amount to an emergency, and that, regardless, the Town did not conduct a thorough enough investigation at the time to justify its belief that emergency action was warranted.

To assess this argument, we ask what sort of scrutiny we should apply to an official decision that emergency action is required. Other courts of appeals have held that such decisions must be analyzed very deferentially. *See Catanzaro v. Weiden*, 188 F.3d 56, 62–63 (2d Cir. 1999); *Herwins*, 163 F.3d at 19; *Harris v. City of Akron*, 20 F.3d 1396, 1404 (6th Cir. 1994). This makes basic sense. As the Court of Appeals for the Second Circuit has explained:

> The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's

11

exposure to dangerous conditions. This quandary is exactly what these emergency procedures are designed to prevent, and is the primary reason they are constitutionally acceptable.

*Catanzaro*, 188 F.3d at 63.

Yet, it is important to avoid the opposite trap. That is, we cannot apply so much deference as to allow "the government [to] avoid affording due process to citizens by arbitrarily invoking emergency procedures." *Id.* Accordingly, we adopt the test laid out by our colleagues in the Second Circuit: "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist . . . [,] the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."[4] *Id.*; *cf. Armendariz v.*

---

[4] Other courts have applied an even more deferential standard, holding that, where government officials act pursuant to a valid "emergency" statute, the decision to bypass a hearing cannot be challenged. *See Herwins*, 163 F.3d at 19 ("Where an official errs in declaring an emergency, the only feasible procedure is a post-deprivation remedy."); *Harris*, 20 F.3d at 1404 (holding that, where an official charged with discretion to invoke emergency procedures perceives an emergency, it is "impracticable to wait for a predeprivation process to run its

*Penman*, 31 F.3d 860, 866 (9th Cir. 1994) ("[T]he rationale for permitting government officials to act summarily in emergency situations does not apply where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances."), *vacated in part on other grounds*, 75 F.3d 1311 (9th Cir. 1996) (*en banc*).

Thus, in analyzing the Town's decision to condemn summarily the apartments, we look to whether there was "competent evidence" supporting the reasonable belief that the mold situation presented an "emergency," and to whether the Town's actions were otherwise "arbitrary" or an "abuse of discretion."[5]    We conclude that, under that

course"). We believe that this degree of deference is both unnecessary and inconsistent with the Supreme Court's suggestion that "if a pattern of abuse and arbitrary action were discernable from review of an agency's administration of a summary procedure," the use of that procedure might be unconstitutional. *Hodel*, 452 U.S. at 302 n.46.

[5] Our analysis of whether the Town acted properly in invoking summary procedures is complicated because the record does not make clear which procedures the Town invoked. On the one hand, the briefs submitted by the parties make reference to § 109 of the Elsmere Property Maintenance Code, which specifically addresses "Emergency Measures." *See, e.g.*, Club's Br. 26 ("In the underlying action, the Town relied on the 'Emergency Measures' section of the Town's Property Maintenance Code."); Town's Br. 50–51 (citing § 109.6). On

13

the other hand, the condemnation notices that the Town issued in connection with its actions referred to § 108 of the Elsmere Property Maintenance Code, which governs *non*-emergency condemnations, and the Town twice cited that provision in its brief. Town's Br. 46, 47.

We do not believe that our analysis is affected either way. Section 109 empowers a "code official," upon a perception of an "actual or potential danger to the building occupants," to condemn a building immediately. BOCA Nat'l Bldg. Code as adopted by the Town of Elsmere §§ 109.1, 109.6 (emphasis omitted). Section 108 permits a "code official" to "condemn" a property upon a finding that it is "unfit for human occupancy." §§ 108.1.3, 108.3. The main difference between the two sections seems to be that § 109 allows the city to make "emergency repairs" to the property, § 109.2, and to recover costs from the property owner, § 109.5, while § 108 requires the Town to provide the owner with postdeprivation notice explaining the reasons why the property was condemned and what repairs must be made before the building can be reoccupied, *see* § 108.3 (requiring notice in accordance with § 107.2); § 107.2 (instructing that notice include both a "statement of reasons" and a "correction order").

That difference has no bearing on our analysis. Both § 109 and § 108 provide authority for the Town to do what it did in this case—make an on-the-spot determination that a property is unsafe and order it vacated without any predeprivation notice. What triggers the kind of deference we apply here is not the invocation of procedures labeled "emergency." Rather, it is the exercise of statutorily based discretion to act unburdened by the requirement to provide a predeprivation hearing where it is

14

standard, the Town's failure to provide a predeprivation hearing did not amount to a constitutional violation.

It is useful to compare the facts here with those presented in *Catanzaro*. There, the City of Middletown, New York, used emergency procedures to demolish two privately owned buildings whose shared foundation had been damaged by a car accident. *Catanzaro*, 188 F.3d at 58-59. The buildings' owners argued, as the Club does here, that the City had acted rashly, failing both to determine fully whether the crash had affected the buildings' structural integrity and to explore less drastic measures of addressing the problem. *Id.* at 59. The *Catanzaro* Court nonetheless concluded that, even were the buildings structurally sound, "no reasonable trier of fact could find that [the City] acted arbitrarily[,] or otherwise abused [its] discretion, in deciding to invoke the emergency procedure." *Id.* at 63. That is because "[t]he undisputed evidence of the damage to the buildings provides ample support for a conclusion that [the City] had a reasonable belief that the public was in immediate danger." *Id.*

We believe a similar conclusion is warranted here. It is undisputed that the sealed-off basement apartments were

judged that the situation demands urgent action. *See Mackey v. Montrym*, 443 U.S. 1, 17 (1979) ("We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety."). Thus, whether the Town acted under § 108 or § 109, our analysis is the same.

15

overrun with mold. It is also undisputed that Blomquist consulted several state experts who told him that the mold potentially posed a substantial and immediate threat to the health and welfare of the Apartments' residents. Given that, we cannot say that the Town acted unreasonably in summarily condemning the Apartments. It is true that the investigation of the mold situation was far from perfect. We are particularly troubled, as was the District Court, by the failure to inspect any of the occupied units to determine whether toxic mold was in fact spreading up from the basements. Nonetheless, we are reluctant to second guess the decision to act on an urgent basis. Where government officials are faced with a situation in which a failure to act quickly could have serious health consequences, perfection or near perfection is not the standard. Given the mold problem in the sealed basement apartments, and the Town's reliance on the advice of experts, the Town's actions cannot be characterized as arbitrary or an abuse of its discretion. We therefore hold that due process did not require a predeprivation hearing before the Town condemned the Apartments.

## B. Was an Adequate Postdeprivation Remedy Provided?

Having concluded that a predeprivation hearing was not required, we must nevertheless determine whether the postdeprivation remedy the Town offered was adequate. Even where exigent circumstances exist, it is still necessary to make available "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking" in order to "satisfy the requirements of procedural due

16

process." *Parratt*, 451 U.S. at 539. If an adequate postdeprivation remedy existed, and the Club failed to avail itself of it, then we must affirm the District Court's grant of summary judgment. *Cf. Alvin*, 227 F.3d at 116 ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate.").

The Club concedes that the regulation under which the Apartments were condemned did provide for a postdeprivation appeals process. It further concedes that it did not appeal the condemnation decision. Club's Br. 13. However, it argues that it was not required to avail itself of the appeals process because that process was inadequate. More specifically, the Club contends that the body to which appeals were required to be taken—the Board of Building Appeals—did not exist. The Town responds that it did have a board—the Board of Adjustment—capable of adjudicating the appeal, and, accordingly, the Club should have pursued its appeal with the Board before bringing a due process claim in federal court.

### 1. Understanding the Relevant Code Provisions

To understand what type of postdeprivation relief was available to the Club, we must look to the Elsmere Town Code and its legislative history. In lieu of writing its own building codes, the Town adopted, with slight modifications, various model codes published by the Association of Building Officials

17

and Code Administrators (known as BOCA codes).  Relevant for our purposes is what the Town did in adopting significant provisions of the 1996 BOCA National Building Code and the 1996 BOCA National Property Maintenance Code.  The latter provided the regulations under which the Apartments were condemned.  Section 111 of that Code specifies the means of appeal:

> **PM-111.1 Application for appeal:** Any *person* affected by a decision of the code official or a notice or order issued under this code shall have the right to appeal to the board of appeals, provided that a written application for appeal is filed within 20 days after the day the decision, notice or order was served.  An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means.

> **PM-111.2 Membership of the board:** The board of appeals shall

consist of five members appointed by the chief appointing authority as follows: one for five years, one for four years, one for three years, one for two years, and one for one year. Thereafter, each new member shall serve for five years or until a successor has been appointed.

. . . .

**PM-111.3 Notice of meeting:** The board shall meet upon notice from the chairman, within ten days of the filing of an appeal, or at stated periodic meetings.

**PM 111.4 Open hearing:** All hearings before the board shall be open to the public. The appellant, the appellant's representative, the code official, and any *person* whose interests are affected shall be given an opportunity to be heard.

**PM-111.4.1 Procedure:** The board shall adopt[,] and make available to the public through the secretary, procedures under which a hearing

19

will be conducted. The procedures shall not require compliance with strict rules of evidence but shall mandate that only relevant information be received.

. . . .

**PM-111.6 Board decision:** The board shall modify or reverse the decision of the code official by a concurring vote of three members.

**PM-111.6.1 Resolution:** The decision of the board shall be by resolution. Certified copies shall be furnished to the appellant and to the code official.

**PM-111.6.2 Administration:** The code official shall take immediate action in accordance with the decision of the board.

**PM-111.7 Court review:** Any *person*, whether or not a previous party of the appeal, shall have the right to apply to the appropriate court for a writ of certiorari to

correct errors of law. Application for review shall be made in the manner and time required by law following the filing of the decision in the office of the chief administrative officer.

BOCA Nat'l Prop. Maint. Code §§ 111.1, 111.2, 111.3, 111.4, 111.4.1, 111.6, 111.6.1, 111.6.2, 111.7 (emphasis in original).

The Town, however, chose not to adopt verbatim § 111.1 through § 111.3 of the National Property Maintenance Code. Instead, in its ordinance adopting the Property Maintenance Code, the Town changed § 111.1 to read: "Any person affected by any notice which has been issued pursuant to this Ordinance may appeal the decision of the Code Official to the Board of Building Appeals, pursuant to § 121.0 of the BOCA National Building Code in effect, as amended," and deleted §§ 111.2 and 111.3. Elsmere, Del., Ordinance § 330. All other subsections of § 111 governing the appeals process remained in effect.

Section 121.1 of the BOCA National Building Code provides:

**121.1 Application for appeal:** Any person shall have the right to appeal a decision of the code official to the board of appeals. An application for appeal shall be

21

based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or an equivalent form of construction is to be used.

Section 121.2 of the BOCA National Building Code, as amended by the Town, *see* Elsmere, Del. Ordinance § 329, provides:

**121.2 Membership of board:** The board of appeals shall consist of five members appointed by the Mayor as follows: One for three years, two for two years, and two for one year. Thereafter, each new member shall serve for three years or until his successor has been appointed. No member of the board shall be in the employ of the Town of Elsmere or an elected official of the Town of Elsmere.[6]

---

[6] The model version of § 121.2 provides that "[t]he board of appeals shall consist of five members appointed by the chief appointing authority as follows: one for five years, one for four years, one for three years, one for two years, and one for one

22

Thus, the Town Code, even as amended, referred parties to the "board of appeals," not the Board of Adjustment, which is the administrative body the Town claims it made available to the Club.[7]

## 2. Board of Appeals vs. Board of Adjustment

With this background in mind, we turn to the parties' contentions. There is no dispute that when the Club filed its appeal no entity called the "Board of Building Appeals" existed in the Town. Nonetheless, after receiving the Club's appeal, the Town informed it that "while the BOCA National Building Code refers to the Board of Building Appeals, the Town of Elsmere refers to its appellate body as the Board of Adjustment." The Club contends that the Board of Adjustment did not have the authority to sit as the Board of Building Appeals for the condemnation action, and that therefore the Town failed to provide adequate means for it to challenge the

___

year." BOCA Nat'l Bldg. Code § 121.2. Thus, the effect of the amendment was to alter the way in which membership terms on the board were staggered.

[7] Section 111.1 of the Property Maintenance Code refers to this body as the "Board of Building Appeals," as did the Town and the Club in their correspondence. However, § 121 refers to the "board of appeals." We assume that these terms both refer to the same, nonexistent, body, and, accordingly, use them interchangeably.

condemnations, despite directing it to the Board of Adjustment for its appeal.

It appears, however, that the Board of Adjustment would have been able to hear the Club's appeal. The Board of Adjustment is established as part of the Town's Zoning Code. *See* Elsmere, Del., Code § 225.40 (providing for the authority of the Board). But the membership requirements for the Board of Adjustment are identical to the membership requirements of the Board of Building Appeals as outlined in the amended Code: both boards have five members, appointed by the Mayor in a staggered fashion, with members ultimately each serving three-year terms. *See id.* (explaining the membership requirements of the Board of Adjustment); BOCA Nat'l Bldg. Code § 121.2 (explaining the membership requirements of the board of appeals). This appears to have been intentional. That is, it appears that, when the Town amended the composition of the appeals board under both the BOCA National Property Maintenance Code and the BOCA National Building Code, it did so specifically in order that the Board of Adjustment could also act as the Board of Building Appeals. *See* Town's Br. 53 & n.24. It merely failed to change the name of the body referenced in the Code accordingly.[8]

---

[8] Indeed, in 2003, the Town amended § 111 to change "board of appeals" to "Board of Adjustment of the Town of Elsmere" to make clear that the latter body is empowered to hear appeals of condemnation decisions. *See* Elsmere, Del., Ordinance 420 § 171-6(e).

24

This allows us to understand how the Town structured its administrative appeals system. One board would carry out the appellate function under each of the three codes: the Property Maintenance Code, the Building Code and the Zoning Code. *See* Elsmere, Del., Code § 225.40(1)(a) (giving the Board of Adjustment the authority "[t]o hear and decide appeals where it is alleged there is an error in any order, requirement decision or determination made by an administrative official in the enforcement of appropriate laws and codes of the State of Delaware"). When acting as the appellate board under the Property Maintenance Code, the Board would carry out the appellate procedures outlined in § 111.0 of that Code (as amended). When acting as the appellate board under the Building Code, the Board would carry out the appellate procedures outlined in § 121.0 of that Code (as amended). Finally, when acting as the appellate board under the Zoning Code, it would carry out the appellate procedures outlined in Chapter 225.40 of that Code.

Thus, there was an administrative body empowered to hear the Club's appeal (the Board of Adjustment) and procedures (those outlined in § 111) specifically designed to address appeals of condemnation decisions. To be sure, the Town Code did initially point the Club to a body, the Board of Building Appeals, that did not exist. But the Town then took appropriate steps to direct the Club to the correct body, and, in fact, it was with the Board of Adjustment that the Club negotiated a stay of its appeal in exchange for a waiver of the Town's right under its Code to issue a final decision on the

25

matter. We therefore conclude that the Town did provide the Club with adequate means of appealing the condemnations.

### 3. Elsmere Park Club's Failure to Avail Itself of an Adequate Postdeprivation Remedy

There was an adequate postdeprivation remedy in this case—that of administrative appeal—and the Club concedes that it failed to take such an appeal. Club's Br. 13. We have held that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin*, 227 F.3d at 116. Thus, the Club's failure to take advantage of that process means that it cannot claim a constitutional injury.

This requirement that a plaintiff avail itself of the processes available differs from the administrative exhaustion requirements that appear in other civil rights contexts. *See id.* Administrative exhaustion is not generally required in § 1983 suits. *See McGreevy v. Stroup*, 413 F.3d 359, 369 (3d Cir. 2005). However, as we explained in *Alvin*, "exhaustion . . . is analytically distinct from the requirement that the harm alleged has occurred. . . . [A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin*, 227 F.3d at 116. Thus, it is not that the Club lost its claim because it failed to litigate it fully through local procedures before seeking federal relief. Rather,

26

because the constitutional injury alleged is the Town's failure to provide adequate procedures to the Club, no such injury could have occurred where the Club has failed to take advantage of the procedures actually offered, at least not absent a showing that the process offered was "patently inadequate." *Id.*

Here, there is nothing in the record to suggest that the appeals process was inadequate, at least not once the confusion regarding to which administrative body the Club was supposed to appeal was resolved. Indeed, § 111 describes an appeals process in which the Board holds a prompt and open hearing, announces its resolution, and then provides for further appeal to the Mayor. The Club could have availed itself of this facially adequate postdeprivation process, presenting arguments about whether the condemnations were justified in light of the circumstances. But it did not. Instead, it abandoned its appeal and filed suit in the District Court. Having failed to take advantage of the available process, the Club has not demonstrated a violation of the Due Process Clause of the Fourteenth Amendment and thus cannot maintain a successful § 1983 action in federal court.

\* \* \* \* \*

For these reasons, we affirm the District Court's grant of summary judgment.

27