

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-15-2008

# Hession v. Prudential Ins Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3017

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Hession v. Prudential Ins Co" (2008). *2008 Decisions*. Paper 109.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/109

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-3017

_____

CYNTHIA HESSION,

Appellant

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA

__

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 06-cv-01641)
District Judge: Honorable Ronald L. Buckwalter

Submitted Under Third Circuit LAR 34.1(a)
June 9, 2008

Before: AMBRO and CHAGARES, Circuit Judges, and GREENBERG, Senior Circuit
Judge.

_____

(Filed: December 15, 2008 )

_____

OPINION OF THE COURT

_____

CHAGARES, Circuit Judge.

Cynthia Hession appeals the District Court's grant of summary judgment in favor

of appellee Prudential Insurance Company of America (Prudential) on Hession's claim

for restoration of her disability retirement benefits under the Employment Retirement Income Security Act of 1974, 29 U.S.C.§§ 1001-1461 (2008) (ERISA). Because Prudential's termination decision was arbitrary and capricious under a properly heightened standard of review, we will reverse the District Court's decision.

I.

Prior to its acquisition by Bank of America, MBNA was the world's largest independent credit card issuer. MBNA contracted with Prudential to deal with certain benefits that MBNA provided for its employees. Under the terms of the contract, Prudential funds, administers, and determines eligibility for Long-Term Disability (LTD) benefits for MBNA's employees. See Joint Appendix (JA) 52. This contract satisfies the parameters of an employer-sponsored benefit plan. It therefore falls under the aegis of ERISA, and is subject to ERISA's requirements.

On February 19, 1991, Hession was involved in a car accident that resulted in injuries to her neck and spine, and that eventually necessitated three separate surgeries to fuse various of her cervical vertebrae. JA 169. The effects of this accident disabled Hession totally for approximately eight years, until January 4, 1999, when Hession began working as a Fraud Services Representative for MBNA. Hession's job required her to use a computer and telephone while seated at a desk, turning her neck "continuously in all directions." JA 95-96.

Hession's first surgery took place in April 2001. By the summer of 2004, however, she was experiencing increasing pain in her neck and right arm, and so she

underwent a second surgery in September 2004. She returned to work in early October, but left again in November 2004, asserting that her medical condition rendered her unable to continue working.

On December 4, 2004, Hession applied for LTD benefits, premised on neck, arm, and shoulder pain, which she claimed had increased after the second surgery failed to ease her discomfort. On February 16, 2005, Prudential approved her claim, and began to pay Hession LTD benefits. Exactly one month later, however, Prudential reversed its decision, informing Hession that it had reviewed her claim file and determined that she was not, in fact, precluded from performing her job functions and that it would cut off her LTD benefits on April 1, 2005. On May 11, 2005, Hession appealed this decision and submitted additional medical records. On May 20, 2005, Prudential upheld its initial denial, and Hession appealed again. In response to this second appeal, Prudential retained Dr. R. David Bauer to review Hession's records, and asked Dr. Bauer to answer several questions about Hession's claim. Dr. Bauer issued a report, and based in large part upon this report, Prudential again upheld its decision to deny Hession benefits.

On April 19, 2006, Hession filed this action, seeking reinstatement of her LTD benefits. On June 8, 2007, after receiving cross-motions for summary judgment, the District Court granted Prudential's motion. This appeal followed.[1]

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331; we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment. See Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 416 (3d Cir. 2008).

II.

When an ERISA benefit plan grants its administrator discretionary authority to determine benefits or to construe the terms of the plan, we review the administrator's decisions under the arbitrary and capricious standard. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Under this standard, a court will "overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law," and "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993).

But not all administrators' decisions receive the same level of deference, because sometimes "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004). In such cases, we have adopted a sliding scale approach to address an administrator's possible conflicts, whereby the level of deference is set "in accordance with the level of conflict. Thus, if the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most of its discretion is stripped away." Post v. Hartford Ins. Co., 501 F.3d 154, 161 (3d Cir. 2007).

Two categories of conflicts determine how we apply heightened arbitrary and capricious review. First are "structural conflicts." One structural conflict that "raise[]s

4

particular concern" is when a plan is "funded and administered by an outside insurer." Id. at 163. This is because we "are wary of according a fiduciary deference when the structure of the plan gives it financial incentives to act against the participants' interest." Id. at 162. Therefore, "a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds." Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000).

Besides structural conflicts, a benefits determination may also be infected by procedural conflicts. To assess whether procedural conflicts exist, "courts must . . . examine the process by which the administrator came to its decision to determine whether there is evidence of bias." Post, 501 F.3d at 164. Such evidence includes, but is not limited to, the insurer's reversal of its position without additional medical evidence; "self-serving selectivity in the use and interpretation of physicians' reports"; ignoring recommendations from the insurer's own representatives that benefits be awarded; and requiring a medical examination even where all signs point to disability. Id. at 164-65. The ultimate question is whether "the administrator has given the court reason to doubt its fiduciary neutrality." Id. If so, then the court must heighten its scrutiny somewhat, and the level of heightened scrutiny will be determined by the breadth and depth of the procedural irregularities. See id.

## III.

The Plan defines a member as disabled when he or she is "unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or

**injury**," and where the sickness or injury has caused a 20% or greater loss in the member's indexed monthly earnings. JA 29 (emphasis in original). In turn, "material and substantial duties" are defined as duties that are "normally required for the performance of your regular occupation," and "regular occupation" means the occupation as it is normally and routinely performed. Id. As noted, Prudential first determined that Hession met this standard; and then later reversed this decision. We turn first to whether the District Court applied the proper level of scrutiny to this reversal.

A.

The District Court held that a heightened arbitrary and capricious standard of review was appropriate because Prudential both funds and administers MBNA's Plan. But the court also held that "only a slightly heightened arbitrary and capricious standard is mandated in this case, affording Prudential's determination a moderate degree of deference," because "the record lacks evidence showing that the conflict actually affected Prudential's final benefit determination." Hession v. Prudential Ins. Co. of Am., Civ. A. No. 06-CV-01641, 2007 WL 1700889, at *3 (E.D. Pa. June 8, 2007). Under this standard, the District Court held that Prudential did not act arbitrarily or capriciously in reversing its decision to award Hession benefits.

We hold that the District Court applied an improperly deferential standard of review. Specifically, the District Court did not heighten the standard of review sufficiently to account for the structural conflict inherent in Prudential's decision, and did not recognize that procedural conflicts were also present.

6

Prudential is an outside insurer who both funds MBNA's Plan, and makes the decisions whether or not to pay claims under that Plan. In Post, we noted that "[t]his is the very sort of conflict that Pinto declared to be substantial and worthy of raising the standard of review," not just slightly, but rather "sufficient to require at least moderately heightened review." Post, 501 F.3d at 165. The District Court, instead, seemed to follow the analysis in Stratton, which applied the low end of the sliding scale of heightened arbitrary and capricious review where a structural conflict was "trivial." But in Stratton, "what made the conflict trivial was that the employer/administrator, while conflicted, was a step removed from the claim evaluation process." Post, 501 F.3d at 165. Here, by contrast, we have the same situation as in Pinto and Post, where the outside insurer administrator wore both the funding and evaluating hats. Accordingly, at least moderately, not just slightly, heightened arbitrary and capricious review was warranted here based on the structural conflict. We now turn to whether the District Court properly found no procedural conflict.

We have held that one type of procedural irregularity that "can raise suspicion" of administrator bias is whether the administrator reverses its position without additional medical evidence. See Post, 501 F.3d at 164-65 (citing Pinto, 214 F.3d at 393). This is what happened here. Hession applied for LTD benefits on December 4, 2004. On February 16, 2005, Prudential approved Hession's LTD claim, effective February 16, 2005. This meant that Prudential found Hession "unable to perform the material and substantial duties of your regular occupation due to [Hession's] sickness or injury." JA

7

256. But on March 16, 2005, without any further medical evidence being placed into the record, Prudential reversed its previous decision, asserting that "[t]he medical records in file no longer support a continued impairment from Ms. Hession's regular occupation." JA 261. This is precisely the kind of procedural irregularity that we have held should properly heighten the standard of review. See Post, 501 F.3d at 164-65; Pinto, 214 F.3d at 393. The District Court did not recognize this fact.

Another procedural irregularity indicating Prudential's bias is the circumstance under which it sought, and then relied exclusively on, Dr. Bauer's review. Only after Prudential reversed its decision to grant LTD benefits did it retain Dr. Bauer to conduct a review of Hession's record. Dr. Bauer never examined Hession himself, but issued a report nonetheless, based on a review of Hession's medical records and a viewing of a 16 minute videotape of Hession. This review led Dr. Bauer to opine that Hession "has functional impairments, though her description of the impairment does seem somewhat exaggerated." JA 89. Prudential then relied heavily, if not exclusively, on Dr. Bauer's opinion in deciding to affirm its decision to terminate Hession's benefits.

We have held, however, that when an insurer bases its decision to terminate benefits on a report that itself is not based on a physical examination, "courts must . . . consider the circumstances that surround an administrator ordering a paper review." Post, 501 F.3d at 166. Indeed, the Court in Post faced a situation very similar to this case. There, like here, the insurer terminated the plaintiff's benefits based heavily on the report of a physician who had not performed a physical examination. There, like here, the

8

plaintiff's treating physicians had generally opined that the plaintiff was eligible for LTD benefits. We vacated the District Court's grant of summary judgment to the insurer. The insurer's heavy reliance on a paper review, when nearly all of the plaintiff's treating physicians had found her disabled, was a procedural irregularity that warranted heightened scrutiny. See id.

In our case, Hession's treating physicians opined strongly and repeatedly that she was unable to work full-time. Indeed, not a single treating physician or therapist ever suggested that Hession could return to work on a full-time basis. For example, Hession's surgeon, Dr. Ali Kalamchi, stated that Hession had "difficulty driving and coping with daily activities and certainly cannot return back to work in this capacity." JA 191. Numerous other doctors' reports in the record support this opinion. On November 17, 2004, Dr. Julie Silverstein, one of Hession's treating physicians, examined Hession and stated that the second surgery had left Hession with "very similar symptoms as before," with "sharp agonizing pain" "from the top of the head to the back of the neck," and that she "tried to go back to work on Oct[ober] 4 for four hours per day and was OK but couldn't go back six hours per day." JA 231. Moreover, in a letter requesting a Functional Capacity Evaluation (FCE) for Hession, Dr. Silverstein stated that Hession "has been treated by multiple physicians for debilitating neck, shoulder and arm pain that . . . . has left her unable to perform per usual work related tasks." JA 186.

On April 14, 2005, Hession underwent an FCE by Michelle Williams, an occupational therapist. Williams noted that Hession had been working for three hours per

day for a while, and when she was unable to upgrade from three hours to six hours a day, she stopped working. Williams noted Hession's postural abnormalities, limited range of motion, and pain behaviors, and concluded that Hession qualified for "limited sedentary occupations," but that although "Mrs. Hession fits best into this category[,] her own experience has indicated sedentary work usually aggravates her condition most." JA 174. Williams stated that Hession's "endurance for work may have been better upgraded by adding an hour daily each week rather than going from three hours to six hours a day," and that "Mrs. Hession may be more successful with a part time position given her recent experience of aggravation with a six hour work day." Id.

On May 3, 2005, James Poston, a physical therapist, performed an initial evaluation on Hession, and noted "severe functional restrictions in her cervical spine and [upper extremities]." JA 165. Poston recommended that Hession begin physical therapy, but opined that Hession's "prognosis is guarded at this time and progress will be slow and limited by [Hession's] significant pain symptoms and above noted functional limitations." JA 165.

On November 21, 2005, Dr. Kerry Thompson, another of Hession's treating physicians, wrote a letter summarizing a diagnostic evaluation that Dr. Thompson performed on Hession on October 18, 2005. Dr. Thompson stated that, because of Hession's second surgery had failed to fuse two of her vertebrae, Hession's "clinical condition has progressed to the extent where she has a marked loss in functional capacity and, under no circumstances, might be expected to tolerate any form of employment." JA

10

125. On December 13, 2005, Dr. Gayle Schwartz, a rehabilitation specialist, saw Hession and opined that Hession would not even "be able to tolerate" another Functional Capacity Evaluation because "results would be self-limited by pain and of no clinical value." JA 123.

As noted, we must consider the circumstances surrounding Prudential's decision to terminate Hession's benefits based largely on Dr. Bauer's report – which was not grounded in a physical examination. We hold that Prudential's heavy reliance on Dr. Bauer's paper review, when nearly all of the physicians who treated Hession and actually examined her concluded that Hession was disabled under the Plan's definition, was a procedural irregularity warranting heightened scrutiny.

B.

We now examine whether Prudential's ultimate decision was arbitrary and capricious. We hold that under even a moderately heightened standard, once Prudential retained Dr. Bauer and received his report, its ultimate decision to uphold the reversal and deny Hession LTD benefits was arbitrary and capricious. Accordingly, we will reverse.

As the District Court noted, even when Prudential retained Dr. Bauer, it "did not specifically request Dr. Bauer to assess [Hession's] functional capacity to return to her pre-injury job." Hession, 2007 WL 1700889, at *6. But this oversight did not, in the District Court's evaluation, discredit the report by Dr. Bauer, since he had been asked whether Hession had functional impairments, to list any such impairments and the evidence supporting his opinion, and the appropriate restrictions or limitations on

11

Hession's physical abilities based on those impairments. The District Court concluded that "[t]he above questions/statements Dr. Bauer was asked to assess in his review are sufficient to help [Prudential] make[] its benefit determination decision[,] which is the reason [Prudential] retained Dr. Bauer to review [Hession's] medical records."

In so concluding, the District Court apparently overlooked Dr. Bauer's answers to these "questions/statements"; more specifically, his lack thereof. Dr. Bauer stated that Hession did, in fact, have functional limitations, but never stated what those limitations were, or what restrictions Hession should have on her function based on the limitations. See JA 88. Moreover, Dr. Bauer stated that "[s]uccessful surgery should yield significant improvement in [Hession's] impairment," but again did not state what that impairment was. JA 88.

Prudential used Dr. Bauer's opinion as the primary – indeed, it appears to be the sole – basis for terminating Hession's LTD benefits. Dr. Bauer's opinion regarding an improvement in Hession's condition, however, was based upon Hession undergoing (at some point in the future) a successful surgery to fuse the C6 and C7 vertebrae. Nonetheless, Prudential used this opinion to justify reversing its initial decision to grant Hession benefits, and terminate those benefits, without Hession undergoing another, successful, surgery. Prudential's decision contradicted every other physician and therapist that Hession had seen, and even contradicts a fair reading of Dr. Bauer's report.[2]

_____

[2] Dr. Bauer's only statement that Hession could function in a job similar to the one that she had was his assertion that Hession "should be able to sit for 45 minutes per hour. She should be able to stand and walk and reach without limitations. She should be able to

12

Prudential's decisionmaking process in this case suffered from both structural conflicts and procedural irregularities, warranting a standard of review more stringent than the "slightly heightened" arbitrary and capricious standard employed by the District Court. Moreover, Prudential's reliance on Dr. Bauer's report, in the face of overwhelming contrary evidence, and to the exclusion of that other evidence, was arbitrary and capricious under even a moderately heightened arbitrary and capricious standard. Accordingly, we hold that Hession should be awarded Long-Term Disability benefits under the Plan.

IV.

---

lift up to 10 pounds, and carry 10 pounds, without difficulty." JA 88. But although Dr. Bauer claims that his opinion is "based upon the results" of Hession's FCE, that examination never stated that Hession could even possibly return to work full time. Dr. Bauer's contention that Hession could "stand and walk and reach without limitations" is directly contradicted by the plain language of the FCE, which found that Hession had "active range of motion deficits in the neck, back[,] and shoulders." JA 170. (Indeed, when moving her neck Hession reported "shooting electrical sensations" in her fingers. JA 171.) Moreover, Hession "required upper body support to assist squatting or kneeling and moved slow[ly] and tentatively." Id. Next, Dr. Bauer's statement that Hession "should be able to lift up to 10 pounds, and carry 10 pounds, without difficulty," is likewise contradicted by the FCE. In the lifting and carrying section of the FCE, Hession "was very slow moving and expressed increasing pain" during floor to waist lift, and "[t]his lift was ceased due to the inability to protect [Hession's] back with squatting due to leg weakness." JA 172. Hession was unable to complete the waist to overhead lift at all: she was "unable to reach equally with both arms into the required position for this lift so it was not assessed for safety reasons." Id. In bold, the FCE states, "[b]ilateral overhead lift is not recommended." Id. On the "bilateral carry," Hession "was grimacing and complained of a headache, with radiating pain into the neck." Id. On the "right carry," the FCE noted that Hession's "[d]ecreased sensation would contribute to safety concerns." Id.

13

For the foregoing reasons, we will reverse the judgment of the District Court and will remand with instructions to award Hession LTD benefits by entering summary judgment for Hession, and for further proceedings consistent with this opinion.